IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:      2020-CA-004974
DIVISION:      CV-B
JUDGE:         Hon. Katie L. Dearing

KRISTOPHER JOLLY and CHERYL
JOLLY, his wife; JEREMY LEE and
AMY LEE, his wife; MATTHEW
CIPRIANI; SHAWN O'SHELL and
MALISSA O'SHELL, his wife; PAUL
MASCI and ANGELA MASCI his wife;
NICHOLAS GETTLER; CHARLES
DRYSDALE; LANDON SIMMONS and
SARAH SIMMONS, his wife, SAMUEL
L. BANKS, and AMANDA BANKS, his
wife; WILLIAM REED and HOLLY
REED, his wife; and WESLEY
MILLER and SHANNON MILLER, his
wife;

     Plaintiffs,

vs.

HOEGH AUTOLINERS SHIPPING AS;
HOEGH                 AUTOLINERS
MANAGEMENT      AS;      HOEGH
AUTOLINERS,     INC.;    HORIZON
TERMINAL     SERVICES,       LLC;
GRIMALDI DEEP SEA S.P.A., and
SSA ATLANTIC, LLC,

     Defendants.

_____/

### FIRST AMENDED COMPLAINT

     Plaintiffs, KRISTOPHER JOLLY and CHERYL JOLLY, his wife; JEREMY

LEE and AMY LEE, his wife; MATTHEW CIPRIANI; SHAWN O'SHELL and

MALISSA O'SHELL, his wife; PAUL MASCI and ANGELA MASCI his wife;

NICHOLAS GETTLER; CHARLES DRYSDALE; LANDON SIMMONS and SARAH SIMMONS, his wife, SAMUEL L. BANKS, and AMANDA BANKS, his wife; WILLIAM REED and HOLLY REED, his wife; and WESLEY MILLER and SHANNON MILLER, his wife, sue the Defendants, HOEGH AUTOLINERS SHIPPING AS ("Hoegh Shipping"); HOEGH AUTOLINERS MANAGEMENT AS ("Hoegh Management"); HOEGH AUTOLINERS, INC. ("Hoegh Autoliners"); HORIZON TERMINAL SERVICES, LLC ("Horizon"); GRIMALDI DEEP SEA S.P.A. ("Grimaldi"); and SSA MARINE, INC. ("SSA"), and assert the following:

## Parties, Jurisdiction & Venue

1.     This is an action for damages in excess of $75,000.00 exclusive of interest and costs.

2.     Venue is proper as the cause of action accrued in Duval County, Florida.

3.     This case is brought under the general maritime law of the United States of America saving to suitors the rights and remedies herein, and the Extension of Admiralty Jurisdiction Act set forth in 46 U.S.C. § 30301.

4.     The Plaintiffs are all citizens of Florida.

5.     The male Plaintiffs are all employed as professional firefighters or paramedics with Jacksonville Fire & Rescue ("JFRD"), and were injured on June 4, 2020, in the fire and resulting explosion which occurred on the roll on-roll off car carrier *Hoegh Xiamen* as it was docked at JAXPORT's Blount Island Marine Terminal.  Their titles are as follows:

       a.     Chief Kristopher Jolly

2

    b.    Lieutenant Jeremy Lee;

    c.    Chief Matthew Cipriani;

    d.    Firefighter-Paramedic Shawn O'Shell;

    e.    Lieutenant Paul Masci;

    f.    Firefighter Nicholas Gettler;

    g.    Chief Charles Drysdale;

    h.    Engineer Landon Simmons;

    i.    Firefighter-Paramedic Samuel L. Banks;

    j.    Firefighter William Reed; and

    k.    Engineer Wesley Miller.

6.    All of the female spouses asserting loss of consortium claims are as follows and were and remain married to their spouse:

    a.    Cheryl Jolly, wife of Kristopher Jolly;

    b.    Amy Lee, wife of Jeremy Lee;

    c.    Malissa O'Shell, wife of Shawn O'Shell;

    d.    Angela Masci, wife of Paul Masci;

    e.    Sarah Simmons, wife of Landon Simmons;

    f.    Amanda Banks, wife of Samuel Banks;

    g.    Holly Reed, wife of William Reed; and

    h.    Shannon Miller, wife of Wesley Miller.

7.    Defendant HOEGH SHIPPING, a Norwegian for profit corporation, Drammensveien 134, 0277 Oslo, Norway, was the manager and operator of *Hoegh Xiamen* at all times material hereto.

8.     HOEGH SHIPPING is subject to the jurisdiction of the courts of Florida by virtue of having committed a tort within this State; by causing injury to persons within this state arising out of an act or omission outside of this state while Defendant was engaged in solicitation or service activities within this state or products, materials or things processed, serviced or manufactured by the Defendant were used or consumed within this state in the ordinary course of commerce, trade, or use; or, by engaging in substantial and not isolated activity within this state.

9.     Defendant HOEGH MANAGEMENT, a Norwegian for profit corporation, Drammensveien 134, 0277 Oslo, Norway, was the manager and operator of *Hoegh Xiamen* at all times material hereto.

10.     HOEGH MANAGEMENT is subject to the jurisdiction of the courts of Florida by virtue of having committed a tort within this State; by causing injury to persons within this state arising out of an act or omission outside of this state while Defendant was engaged in solicitation or service activities within this state or products, materials or things processed, serviced or manufactured by the Defendant were used or consumed within this state in the ordinary course of commerce, trade, or use; or, by engaging in substantial and not isolated activity within this state.

11.     Defendant HOEGH AUTOLINERS is a New York for profit corporation, with its principle place of business in Florida, 2615 Port Industrial Drive, Suite 405, Jacksonville, Duval County, Florida 32226, and was engaging in substantial and not isolated activity within this state.  This Defendant was the

4

local arm of HOEGH SHIPPING and assisted with management of the ship and shore operations at all times material hereto.

12.   Defendant HORIZON is a Delaware for profit corporation with its principle place of business in Florida, 818 A1A, Suite 304, Ponte Vedra Beach, FL 32082 and was engaging in substantial and not isolated activity within this state. This Defendant is a subsidiary of HOEGH SHIPPING, and was responsible for obtaining, inspecting, organizing, and preparing the used/junk/wrecked cars portside for safe loading and transport on the *Hoegh Xiamen.*

13.   Defendant GRIMALDI is an Italian for profit corporation, Via Marchese Campodisola, 13 Naples, Italy 80133, which was operating the *Hoegh Xiamen* pursuant to a time charter with HOEGH SHIPPING at all times material hereto.

14.   GRIMALDI is subject to the jurisdiction of the courts of Florida by virtue of having committed a tort within this State; by causing injury to persons within this state arising out of an act or omission outside of this state while Defendant was engaged in solicitation or service activities within this state or products, materials or things processed, serviced or manufactured by the Defendant were used or consumed within this state in the ordinary course of commerce, trade, or use; or, by engaging in substantial and not isolated activity within this state.

15.   Defendant SSA is a Washington for profit corporation, 1131 SW Klickitat Way, Seattle, WA, 98134-1108, authorized and doing business in Florida. This Defendant was operating as the stevedore and was responsible for

the loading of the cargo onto the *Hoegh Xiamen* at the Blount Island terminal in Jacksonville, Florida, and was responsible for the loading of approximately 1,500 used/junk/wrecked cars onto the *Hoegh Xiamen*, that caught on fire and started the fire on or about the 8th deck of the vessel, which then spread throughout the vessel, causing the fire and explosion(s) at issue, and ultimately causing the vessel to be a total loss.

16.    Defendant SSA is subject to the jurisdiction of the courts of Florida by virtue of having committed a tort within this State; by causing injury to persons within this state arising out of an act or omission outside of this state while Defendant was engaged in solicitation or service activities within this state or products, materials or things processed, serviced or manufactured by the Defendant were used or consumed within this state in the ordinary course of commerce, trade, or use; or, by engaging in substantial and not isolated activity within this state.

## Relevant Facts Applicable to All Counts

17.    On June 4, 2020, the *Hoegh Xiamen* (IMO: 9431848), an approximately 600-foot long by 103.5-foot wide roll on roll off ("ro-ro") cargo ship was berthed at JAXPORT's Blount Island Marine Terminal in Jacksonville, Florida to facilitate the loading of approximately 1,500 used/junked/wrecked cars as cargo for international transport to west Africa.

18.    The *Hoegh Xiamen* cargo ship was built in China in 2010, and was sailing under the flag of Norway.

6

19.    At all times material, the cargo ship was owned by Norway based Ocean Yield ASA, but was bareboat or demise chartered to HOEGH SHIPPING and/or HOEGH MANAGEMENT.

20.    HOEGH SHIPPING and/or HOEGH MANAGEMENT then time chartered the *Hoegh Xiamen* to GRIMALDI whereby HOEGH SHIPPING and/or HOEGH MANAGEMENT retained ownership and management, but GRIMALDI staffed the ship with a captain and crew.

21.    Fire is one of, if not the, most dangerous events on any ship and ro-ro ships have a recognized propensity to catch fire -- especially when transporting motor vehicles, and particularly wrecked motor vehicles, which are hazardous cargo, prone to catching fire given the combination of gasoline and automotive batteries which create sparks and ignite.

22.    Defendant GRIMALDI has experienced fires on its other ro-ro auto carrier ships and has written about the dangers of these reoccurring and dangerous automobile fires on ships.  "Grimaldi Group has called for more stringent controls and cargo regulations for vehicles and containers following two fires that broke out on its ro-ro vessel *Grande Europa* last week.  The Italian ocean services provider said there needed to be more controls on car batteries, which often cause short-circuits on board vessels, as well as in port terminals." https://www.automotivelogistics.media/grimaldi-calls-for-stricter-cargo-rules-following-latest-vessel-fires/38301.article (last visited July 30, 2020).

23.    It is well known that transporting used/junked vehicles is dangerous as these vehicles are prone to catch fire.  While new vehicles are

normally fitted with a transportation mode which disables most of the internal electrical circuits and prevents electrical faults (all intended to prevent fires) during shipment, this feature is absent in old cars.

24.   Problems with fire are especially common with vehicles that have spent a significant amount of time awaiting shipment or are in otherwise poor condition.   Internal electrical connections deteriorate as a result of salt in the air; parts seize and seals degrade to the point where flammable fluids leak; electrical cables break down causing electrical faults and shorts to occur; flammable materials —including gas canisters— are sometimes left in the junked cars; and mistakenly leaving the key in the stop/park position often leaves many of the electrical circuits live.

25.   Shortly after loading operations were completed on the afternoon of June 4, 2020, a fire started on deck 7 or 8 of the *Hoegh Xiamen*.  The fire burned and strengthened inside the vessel for an unknown amount of time before Jacksonville Fire & Rescue was contacted to provide emergency assistance.

26.   The fire was able to burn undetected, because the *Hoegh Xiamen* crew had elected to disable and turn off all the fire detection systems while the ship was docked at the port or alternatively because the fire detection systems simply did not work.

27.   The male Plaintiffs were among the approximately 120 JFRD firefighters and paramedics who responded to the scene and attempted to extinguish the blaze on the *Hoegh Xiamen,* ensure the safety of the crew, and

prevent the ship from breaking up, sinking, blocking the shipping channel, exploding, and/or causing an environmental catastrophe.

28.     At all times material hereto, each male Plaintiff was aboard the *Hoegh Xiamen* in his capacity as a fire fighter/paramedic attempting to provide aid and to control and extinguish the fire.

29.     Upon reaching the scene, the first responders were presented with a huge 15 floor cargo ship which was burning uncontrollably from the inside cargo holds.

30.     The firefighters attempted to communicate with the *Hoegh Xiamen* crew to ascertain the location of the fire, what firefighting efforts of the crew had taken place before their arrival, how to get to the fire, and the locations of the ship's fire hose connections.

31.     However, communication was nearly impossible as the *Hoegh Xiamen* crew spoke and/or understand very little English, and could not communicate with the first responders or provide meaningful information concerning the ship, the location of the fire, or even how to get to it.

32.     The JFRD logs provide: "DIFF TIME COMMUNICATING WITH CREW OF THE SHIP THEY DON'T SPEAK GOOD ENGLISH TRYING TO FIND OUT WHERE THE FIRE IS COMING FROM". 16:10:31 "CREW SPEAKS CHINESE". 16:20:15   The first responders had a difficult time accounting for the crew because of the "language barrier"  16:24:17

33.     Due to the *Hoegh Xiamen* crew's inability to communicate the location of the fire and how to get to it, JFRD had to send reconnaissance crews

into the dark, burning, ship to find the fire, and to find a route to access and fight the fire.

34.    The failure to provide a crew able to communicate with first responders at the port of call —able to provide basic information such as the location of the fire and how to get to the fire to fight it— caused a loss off valuable time as the fire, and heat from the incinerating cars inside the decks of the ship grew unabated, threatening to break up the ship and cause an environmental disaster in the St. Johns River.

35.    Unable to communicate with the crew concerning the location of the fire, and with all 21 members of the crew safely evacuated off the *Hoegh Xiamen*, JFRD sent multiple reconnaissance crews of firefighters into and on top of the *Hoegh Xiamen.*

36.    The failure of Defendants Hoegh and Grimaldi to provide an adequately trained and prepared crew, and the crew's inability to communicate with first responders in Jacksonville, caused a critical 1 hr 40-minute delay from the time the fire was first reported until JFRD could even begin fighting the fire.

37.    Upon entering the *Hoegh Xiamen* to fight the fire, the firefighters proceeded up the stern portside stairwell to where the fire was believed to be emanating on the aft 8th deck.   The deck was full of the smoke, and the temperatures reaching in excess of 1,000 degrees.   Car alarms were sounding and headlights flashing from the incinerating cars as the fire and heat spread inside the dark, smoky, closed, and cramped cargo hold decks.

38.    Further, despite the known risks of fires from transporting wrecked cars with intact electricity and gas tanks in close cramped decks, the *Hoegh Xiamen* was not equipped with a water sprinkler system, functioning fire dampers on the starboard side of the ship, or even internal fire hose connections on the attack stairwell to assist the firefighters or crew in obtaining water to fight the blaze.  Without adequate or appropriate systems to detect and extinguish the blaze, the cargo decks packed tight with flammable wrecked automobiles, burned unabated inside the ship.

39.    Given the lack of fire hose connections, the firefighters were forced to connect the fire hoses on the pier below and drag them up through the ship from the ground, while attempting to keep the water lines unkinked.  The cars were so tightly packed into the ship that the fire fighters had difficulty getting to the fire: "Too many cars they would just be blind spraying/because of how tight the cars are".  17:04:39.  Additional hoses were brought in and connected and stretched and charged, from the pier, up the 5th deck ramp, over and around cars and cargo on the 5th deck, up the aft port stairwell, and to the 8th deck.

40.    Finally, at 17:36, the command was given, "YOU CAN ADVANCE", and upon entry the firefighters noted, "MADE ENTRY CAN SEE A GLOW ON CARS / WORKING OUR WAY OVER".  However, due to the extreme heat, at 17:39 the initial attack team was called out, "GUYS ARE PUSHING TIME COME OUT AND REHAB".

41.    Crews were switched out, as the fire continued to grow, "DECK 7 IS FULL OF SMOKE / DECK 8 & 9 ARE FULL OF HEAT AND SMOKE".  JFRD Logs,

@ 17:49.  Crews switched out continuing to fight the heat and fire.  At 18:30 another crew was called out to rehab.  The fire-fighting crew exited the 8th deck, and were going down the stairwell as the next crew was staging on the 5th floor landing of the stairwell, and the Chief of the next crew was standing on the 8th floor landing awaiting the new attack crew.

42.     At that time and place, on the *Hoegh* Xiamen, in Jacksonville, Florida, birthed at the port on Blount Island, at @ 18:45, there was a huge explosion within the ship.  The firefighters heard a "growl" or "roar" and could feel the entire ship begin to vibrate and the Firemen were hit by the explosion that roared down the stairwell, blasting them with continuous severe heat while they were trapped in the stairwell of the ship.

43.     The heat from explosion, and the power of the blast, severely burned faces, hands, and bodies of the firefighters, blasted several firefighters out of the 5th deck doorway and over cars on the 5th deck, and threw others down flights of stairs, snapped bones, tearing flesh, and causing severe physical and emotional trauma as the first responders believed they were going to be trapped inside the ship and burned to death.

44.     The *Hoegh Xiamen* continued to smolder and burn for the next eight days.   Unable to re-enter the ship after the explosion, JFRD continuously sprayed water on the outside of the ship to maintain its integrity and prevent an environmental disaster while the inside of the ship and its combustible cargo continued to burn from the inside.

45.     As a result of the fire, explosion, and/or resulting firestorm, all of the firefighters and paramedics ("the Plaintiffs") in paragraph five suffered bodily injury and resulting suffering, pain, disability or physical impairment, disfigurement, mental anguish, aggravation of any previously existing condition, lost wages, loss of earning capacity, inconvenience, loss of capacity for the enjoyment of life, and medical expenses.  These losses are either permanent or continuing and Plaintiffs will suffer such losses in the future.

46.     As a result of the explosion and resulting firestorm, each of the spouses in paragraph six has lost the care, comfort, consortium and services of their husbands, and these losses will continue into the future.

### Count I: Negligence of Hoegh Shipping & Hoegh Management (Owner/Manager)

47.     Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 10 and 17 through 46, and further allege:

48.     At all times material hereto, Defendant Hoegh Shipping and/or Hoegh Management were the owners/managers of the *Hoegh Xiamen* and owed a duty to exercise reasonable care towards Plaintiffs, who were lawfully aboard the vessel, but were not members of the crew.

49.     At all times material hereto, Defendant Hoegh Shipping and/or Hoegh Management was/were the "Company" as defined by ISM Code 1.1.2 and as such agreed to or assumed or were otherwise responsible to ensure that the *Hoegh Xiamen* and its crew complied with all International Maritime Organization and United States codes, statutes and regulations.

13

50.     Defendants Hoegh Shipping and/or Hoegh Management negligently breached that duty of reasonable care, including but not limited to in the following ways:

a.     Failing to maintain the ship in a reasonably safe condition, including but not limited as to the fire prevention, detection, response, and extinguishment;

b.     Failing to equip the *Hoegh Xiamen* with reasonable systems and protections for fires, including appropriate smoke detectors, alarms, video surveillance (CCTV), automatic fire dampers, functioning and/or adequate fire suppression systems, and fire hose connections -- especially given the ship was being utilized to transport highly combustible cargo known to catch fire;

c.     Failing to ensure that the crew aboard the *Hoegh Xiamen* was adequately trained, equipped, supervised, and instructed regarding all aspects of preventing and fighting fires -- including but not limited to the proper and time sensitive operation of the $CO_2$ system;

d.     Failing to supply and provide sufficient tools and/or supplies to promptly extinguish a cargo fire onboard and boundary cool the vessel;

e.     Failing to implement or follow a Safety Management System compliant with the International Safety Management Code;

14

f.     Failing to implement and follow a cargo plan compliant with the International Maritime Dangerous Goods Code;

g.     Permitting dangerous conditions to exist on the ship in violation of industry customs, standards, the exercise of reasonable care in light of the risks at hand, and safety regulations; and

h.     Failing to provide a vessel that was reasonably fit for its intended purpose.

51.   Hoegh Shipping and/or Hoegh Management's negligence proximately caused the injuries and losses sustained by the Plaintiffs as described above.

WHEREFORE, Plaintiffs demand judgment against Defendant HOEGH AUTOLINERS SHIPPING AS, and HOEGH AUTOLINERS MANAGEMENT AS for damages and costs of suit, together with such other relief as the Court deems meet and just.

## Count II: Negligence of Grimaldi

52.   Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 6, 13 and 14, and 17 through 46, and further allege:

53.   At all times material hereto, Defendant Grimaldi DEEP SEA SpA was in possession and control of the *Hoegh Xiamen* and was operating the vessel pursuant to a time charter with Hoegh Shipping and/or Hoegh Management.

54.    Grimaldi owed a duty to exercise reasonable care in the outfitting and operation of the ship, including to Plaintiffs who were lawfully aboard the vessel but were not members of the crew.

55.    Defendant Grimaldi was the company as defined by ISM Code 1.1.2 and as such agreed to or assumed or was otherwise responsible to ensure that the *Hoegh Xiamen* and its crew complied with all International Maritime Organization and United States codes, statutes and regulations.

56.    Defendant Grimaldi negligently breached its duties of reasonable care, including but not limited to in the following ways:

> a.    Failing to maintain the ship in a reasonably safe condition, especially with respect to fire prevention, detection, and extinction systems;
>
> b.    Failing to engage, keep on, adequately inspect and/or repair known problems with the vessel and its safety systems;
>
> c.    Failing to properly utilize the CO2 system so as to extinguish the blaze before it was permitted to spread;
>
> d.    Failing to implement or follow a Safety Management System compliant with the International Safety Management Code;
>
> e.    Failing to implement and follow a cargo plan compliant with the International Maritime Dangerous Goods Code;
>
> f.    Failing to recognize the danger of employing a crew unable to understand and/or communicate in the English language and

16

communicate with first responders in an emergency situation such as a fire at the vessel's ports of call;

g.   Failing to designate one or more individuals able and available to communicate with first responders in the event of an emergency where assistance was required and basic information concerning the ship would need to be relayed;

h.   Failing to ensure that the crew onboard the *Hoegh Xiamen* was properly trained and instructed regarding all aspects monitoring, detecting, preventing and responding to vehicle and ship fires;

i.   Failing to maintain adequate tools and supplies to promptly extinguish a vehicle fire onboard the vessel;

j.   Failing to adequately monitor the loading of the vessel and storage of cargo, and to extinguish the fire before it spread out of control – especially given the decision to disable the fire detection systems;

k.   Failing to ensure that the wrecked/junked vehicles were properly stored, and/or did not have keys in the ignitions, batteries connected, and/or other visible dangers prior to and/or once loaded such as visible leaks and damaged batteries; and

l.      Failing to intervene timely during the loading when it should have become clear the hazards, with respect to the junked vehicles, were not being properly addressed.

57.    Grimaldi's breach of one or more of these duties as described above proximately caused the injuries and losses sustained by the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant GRIMALDI DEEP SEA S.p.A., for damages and costs of suit, together with such other relief as the Court deems meet and just.

### Count III: Negligence of Horizon & Hoegh Autoliners

58.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 6, 11 and 12, 17 through 46, and further allege:

59.    At all times material hereto, Defendants Horizon and Hoegh Autoliners were and remain subsidiary corporations of Hoegh Shipping and/or Hoegh Management, and these entities performed the shoreside support work to obtain, store, prepare, and facilitate the transportation of the wrecked/used/junked cars on Hoegh ships leaving out of JAXPORT, including specifically the *Hoegh Xiamen*.

60.    Horizon and/or Hoegh Autoliners were responsible for obtaining, inspecting, organizing, storing, and preparing the wrecked/junked cars for transport on the *Hoegh Xiamen* as well as providing any shoreside support required by the vessel.

61.    Defendants Horizon and Hoegh Autoliners owed a duty to exercise reasonable care towards people like Plaintiffs who would be injured if these Defendants failed to ensure that the vehicles being loaded onto the ship were safe for transport.

62.    Defendants Horizon and/or Hoegh Autoliners negligently breached their duties of reasonable care in one or more of the following ways:

      a.    Failing to maintain and/or prepare the wrecked/used/junk vehicles in reasonably safe condition, fit for international transport, especially in light of the known risks and dangers of fires with used cars crammed together in closed, cramped, decks on ro-ro transport ships;

      b.    Failing to adequately inspect and test the vehicles prior to positioning them for loading onto the ocean liner for fitness to be transported;

      c.    Failing to ensure that the batteries and/or sources of electrical spark and/or fire were disconnected and/or removed from the vehicles before they were loaded onto the vessel;

      d.    Failing to ensure that the fuel tanks were emptied and/or not punctured and thus a source of explosion before loading them onto the vessel;

19

     e.     Failing to drain the gasoline and/or disconnect and/or remove batteries and/or sources of electricity or spark from the wrecked cars; and

     f.     Failing to supply and provide sufficient tools and supplies to promptly extinguish a cargo fire during loading operations;

63.    Horizon and/or Hoegh Autoliners' breach of one or more of these duties as described above proximately caused the injuries and losses sustained by the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant HORIZON TERMINAL SERVICES, LLC, and HOEGH AUTOLINERS, INC., for damages and costs of suit, together with such other relief as the Court deems meet and just.

## Count IV: Negligence of SSA

64.    Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 6, 15 and 16, 17 through 46, and further allege:

65.    At all times material hereto, Defendant SSA was responsible for the stevedore operations, loading the wreck/junked/used cars into the *Hoegh Xiamen* and then securing them before the ship departed from port.

66.    SSA owed a duty to exercise reasonable care to accomplish the loading of the hazardous and flammable cargo safely without permitting the cargo to catch fire either during loading or once loaded onto the vessel.

67.    Defendant SSA negligently breached its duties of reasonable care, including but not limited to in one or more of the following ways:

a.    Negligently loading the vehicles onto the *Hoegh Xiamen* without regard to the risk of fire;

b.    Negligently failing to inspect the junked cars prior to loading them onto the vessel;

c.    Negligently failing to ensure that the batteries and/or sources of electrical spark and/or fire were disconnected and/or removed from the vehicles before they were loaded onto the vessel;

d.    Negligently failing to ensure that the fuel tanks were emptied and/or not punctured and thus a source of explosion before loading them onto the vessel;

e.    Negligently failing to ascertain or appreciate that one or more of the used cars was in a dangerous condition, unfit for transport on the closed cramped decks of a ro-ro vessel, including but not limited to having decayed, defective wiring, connected batteries, fuel in the tanks, omitting sparks, smoldering, or in danger of catching fire;

f.    Negligently permitting the fire to spread during or shortly after the loading operations;

g.    Negligently failing to ensure that all of the car keys were out of the ignitions and secured and that there were no electrical sparks or other ignition sources present once the cars were loaded onto the ship;

21

h.   Negligently failing to train for and practice responding to a vehicle fire during loading so as to extinguish the fire promptly before it spread to other vehicles; and

i.   Failing to provide sufficient tools and supplies to promptly extinguish a cargo fire should it occur during loading operations;

68.   The Defendant's breach of one or more of these duties as described above proximately caused the injuries and losses sustained by the Plaintiffs.

WHEREFORE, Plaintiffs demand judgment against Defendant SSA Atlantic, LLC, for damages and costs of suit, together with such other relief as the Court deems meet and just.

PAJCIC & PAJCIC, P.A.

/s/ Curry Gary Pajcic     10.5.20
_____
**CURRY GARY PAJCIC, Esq.**
Florida Bar No.: 21301
**THOMAS F. SLATER, Esq.**
Florida Bar No.: 614114
**BENJAMIN E. RICHARD, Esq.**
Florida Bar No.: 13896
One Independent Drive, Ste. 1900
Jacksonville, FL 32202
Telephone:  (904) 358-8881
Telefax:       (904) 354-1180
Curry@pajcic.com; Tom@pajcic.com;
Ben@pajcic.com
Secondary email: Rose@pajcic.com;
Sandy@pajcic.com
***Attorneys for Plaintiffs***

22