## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

KRISTOPHER JOLLY, et al.,

        Plaintiffs,

vs.                    CASE NO.: 3:20-cv-001150-MMH-MCR

HOEGH AUTOLINERS SHIPPING
AS, et al.

        Defendants.
_____/

### DEFENDANTS HOEGH AUTOLINERS SHIPPING AS AND
### HOEGH AUTOLINERS MANAGEMENT AS'S
### MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants HOEGH AUTOLINERS SHIPPING AS AND HOEGH AUTOLINERS MANAGEMENT AS (hereinafter collectively referred to as "Hoegh Defendants"), by and through undersigned counsel and pursuant to Rule 56, Federal Rules of Civil Procedure, and move this Honorable Court for summary judgment as to Count I (Negligence under general maritime law) of Plaintiffs' First Amended Complaint (Doc. 5).

Hoegh Defendants are entitled to summary judgment because the record shows there is no genuine issue of material fact whether the crew of the M/V Hoegh Xiamen (the "Vessel") provided to the Jacksonville Fire and Rescue Department ("JFRD"), including to all of the Plaintiffs in this case, all information necessary, and indeed all of the information the Vessel's crew had, to satisfy the controlling reasonable care standard under the circumstances when the JFRD arrived to fight the fire on the Vessel

on June 4, 2020. Moreover, the changing conditions that subsequently led to the explosion event[1] that injured Plaintiffs took place over a two hour and forty-three minute period after the Vessel's crew was ordered off the Vessel by JFRD and were the result of a chain of events that was completely separate from the alleged cause of the fire. The Vessel's crew could not possibly have had any actual or constructive knowledge of the changed conditions that caused Plaintiff's injuries, nor, obviously, could they have had a duty to warn of those changed conditions of which they had no knowledge. In addition, assuming, arguendo, that Hoegh Defendants breached a duty owed to Plaintiffs, which they vehemently deny, Plaintiffs have failed to establish proximate cause because they have failed to show that the alleged breach was a substantial factor in bringing about Plaintiffs' alleged injuries. Also, Plaintiffs' attempts to stack inference upon inference with speculation to manufacture proximate cause is impermissible under applicable case law to create a genuine issue of material fact sufficient to avoid summary judgment. Further, the JFRD's actions of opening the ventilation dampers, which caused the explosion, was a superseding cause that completely exonerates Hoegh Defendants from any liability. Finally, Plaintiffs' reliance on the ISM code neither correctly defines the standard of care nor establishes that the standard of care was violated.

---

[1] The explosion event that is the subject of Plaintiffs' First Amended Complaint has been referred to as a "pressurization" event, "explosion," or "backdraft," throughout the record. It is important to note that this event did not involve an explosion of fire or flames. Instead, this event was a release of hot air as described by Plaintiff Jolly (Exhibit G-Jolly Dep. 167:9-24), the cause of which was separate and distinct from the alleged cause of the subject fire. Throughout this Motion Hoegh Defendants refer to this event as an "explosion event" or "backdraft" to be consistent. These terms are meant to refer to the above described explosion event that Plaintiffs allege caused their injuries.

For these reasons, and as set forth more fully below, Hoegh Defendants are entitled to summary judgment as a matter of law.

### Statement of Undisputed Facts

1.      4:01 – 4:03 p.m. Captain Jeffrey Baker of the JFRD and his team of three additional firefighters from Engine 48, Station 48 were the first members of the JFRD to arrive at the Vessel at 4:03 p.m. (**Exhibit A**-Baker Dep. 23:3-25:13; 28:14-17; 29:5-7; 33:17-21; 44:3-5). Captain Baker and Engine 48 were assigned or dispatched to go to the Vessel by the JFRD at 4:01p.m. (Exhibit A-Baker Dep. Exhibit 4, FR/E48, 6/4/2020 4:01 p.m.). Station 48 is located across the street and within sight of the berth where the Vessel was located on June 4, 2020. (Exhibit A-Baker Dep. 28:22-29:2). Pursuant to the JFRD's Standard Operating Guidelines, Captain Baker was in charge of the scene for the JFRD as the only ranking officer in attendance upon his arrival at the Vessel. (**Exhibit B**-Drysdale Dep. 59:9).

2.      The explosion event that Plaintiffs claim caused their injuries happened at 6:46 p.m., two hours and forty-three minutes after the first members of JFRD arrived at the Vessel. (Exhibit A-Baker Dep., See p. 40-41 of 44 of Exhibit 5 at 6:46 & 6:52 p.m.)

3.      4:04 p.m. Captain Jeffrey Baker began speaking to the Captain of the Vessel at 4:04 p.m. and continued to speak to him for several minutes thereafter as documented by page 1 of Exhibit 5 to Captain Baker's Deposition ("PremierOne Report" from the JFRD) and page 1 of Exhibit 6 ("JFRD BLOUNT ISLAND SHIPBOARD FIRE"), both of which are transcripts of Captain Baker's radio

communications with the JFRD where he relays information obtained from the Captain of the Vessel. (Exhibit A-Baker Dep. 34:19-23; 35:2-36:3; 44:20-45:10) (Ex. 5 & 6 to Baker's Dep. transcript.)). The communications from Captain Baker are noted as "UNIT ID: FR/E48" in Exhibit 5 and "ENGINE 48" in Exhibit 6. (Exhibit A-Baker Dep. 7:11-13; 28:4-13; 30:4-16 and Exhibits 5 & 6).

4.    Captain Baker learned from the Captain of the Vessel and relayed via radio to the JFRD: that the Vessel had 11 decks, that the fire was on Deck 8, and enough information to call for a second alarm which is a request for additional JFRD units to help.   (Exhibit A-Baker Dep. 36:4-39:10; See p. 1 of Exhibit 6 under Engine 48 communications).

5.    Captain Baker also learned from the Captain of the Vessel that:  there were vehicles stowed on Deck 8 (Exhibit A-Baker Dep. 40:3-18); the Vessel's crew had "seal[ed] off" the Vessel (Exhibit A-Baker Dep. 44:20-45:10); and two members of the Vessel's crew were activating the Vessel's $CO_2$ system (Exhibit A-Baker Dep. 44:20-45:10).

6.    Captain Baker did <u>not</u> transmit via radio to the JFRD that the Captain of the Vessel had activated the $CO_2$ "because it was just chaotic to me."  (Exhibit A-Baker Dep. 45:13-15; 45:20-46:1).

7.    Captain Baker told the Captain of the Vessel to get all of the crew members off of the Vessel so they could visually account for each crew member. (Exhibit A-Baker Dep. 41:8-21). Within a few minutes of Captain Baker speaking to

the Captain of the Vessel, Captain Baker had confirmed that the Vessel's crew were accounted for and off the Vessel. (Exhibit A-Baker Dep. 41:8-21; 46:2-20).

8.     Captain Baker also obtained the Vessel's fire control plan (a.k.a. ship's plan, map, or layout) from the crew. (Exhibit A-Baker Dep. 42:1-43:8; 69:13-70:3). The Vessel's fire control plan showed the location of the two stairwells that provided access to Deck 8 (Exhibit B-Drysdale Dep. 100:3-5; 106:1-4) and the layout of the fire protection systems on each deck (**Exhibit C**-Kyle Higgins Dep. 118:20-119:21; 120:5-25).

9.     4:11 p.m. At 4:11 p.m. the first Chief from the JFRD arrived at the Vessel, Chief Ryan Lundy (a.k.a. Fire 10 on radio transcripts). (Exhibit B-Drysdale Dep. 59:2-10). Per JFRD's Standard Operating Guidelines, the first Chief on scene is to establish himself as Incident Commander and takes over command from the first officer on scene. (Exhibit B-Drysdale Dep. 59:2-60:8). At the time Chief Lundy arrived at the Vessel, he took control of the scene from Captain Baker and became the number one in command or Incident Commander for the JFRD. (Exhibit B-Drysdale Dep. 59:2-60:8).

10.     After speaking to the Captain of the Vessel, Captain Baker met with the Incident Command (Chief Lundy) to provide him with the Vessel's plans (a.k.a. fire control plan) (Exhibit A-Baker Dep. 43:7-16) and a report of what he had learned from the Captain of the Vessel (Exhibit A-Baker Dep. 43:7-16). Captain Baker was unable to confirm that he told Chief Lundy that the Vessel had been sealed off and that the

Captain of the Vessel had sent two crew members onto the Vessel to activate the CO2. Instead, he testified that "I believe I did." (Exhibit A-Baker Dep. 45:20-23).

11.     The Vessel's CO2 system was activated by the Chief Engineer of the Vessel onto Decks 7 and 8. (**Exhibit D**-Chief Engineer Wang Dep. 39:12-40:14; 41:17-19; 45:4-10; **Exhibit E**-Bolcar Dep. 95:9-14). Lt. McMullen of the JFRD also confirmed that the Vessel's CO2 had been activated by looking into the Vessel's fire control room and noticing that the CO2 handles had been pulled down. (**Exhibit F**-McMullen Dep. 59:16-60:23).

12.     The JFRD's dispatch records the times that each engine arrived at the scene of Vessel and the fire logs show what time each unit arrived at the Vessel. (Cipriani Dep. 30:8-14).

13.     At 4:11 p.m., Plaintiff Chief Drysdale (a.k.a. Fire 4 or F4) arrived on Blount Island. (Exhibit A-Baker Dep., Exhibit 5, p. 30 of 34 at 4:11 p.m.). As soon as Chief Drysdale arrived at the Vessel he spoke to Chief Lundy. (Exhibit B-Drysdale Dep. 63:8-12; 63:21-64:4). By the time Chief Drysdale arrived at the Vessel and spoke to Chief Lundy, the Vessel's crew had already been accounted for and were safely off the Vessel. (Exhibit A-Baker Dep. 41:8-21; 46:2-15; Exhibit B-Drysdale Dep. 66:6-67:25).

14.     4:16 p.m. Plaintiff Chief Cipriani (a.k.a. Fire 7 or F7) arrived at the Vessel no later than 4:16 p.m. based on when radio traffic began addressing him as Fire 7 ("F7"). (**Exhibit G**-Jolly Dep. 80:19-20; Exhibit A-Baker Dep., Exhibit 5, p. 30 of 34

at 4:16 p.m.). Chief Cipriani reported to Incident Command (Chief Lundy) upon arriving at the Vessel. (**Exhibit H**-Cipriani Dep. 32:7-12; 33:3-8; 33:21-25). He never saw the fire control plan. (Exhibit H-Cipriani Dep. 46:9-12). No one provided any information to Chief Cipriani about whether the Vessel's $CO_2$ had been activated or anything about any type of fire suppression system on the Vessel. (Exhibit H-Cipriani Dep. 45:3-8; 45:24-46:8).

15.    4:25 p.m. Even though Captain Baker had ordered all of the Vessel's crew off of the Vessel and accounted for their safety within minutes of arriving (Exhibit A-Baker Dep. 41:8-21; 46:2-15), two crew members had gone back on board to activate the Vessel's $CO_2$ system. (Exhibit A-Baker Dep. 44:20-45:10). However, by 4:25 p.m. Chief Drysdale (Fire 4) confirmed with Incident Commander, Chief Lundy (Fire 10), that "all crew members are accounted for." (Exhibit A-Baker Dep., Exhibit 5, p. 31 of 44 at 4:25 p.m.).

16.    4:37 p.m. Plaintiff Chief Jolly (a.k.a. Fire 9) arrived no later than 4:37 p.m., which is the time of his first radio transmission. (Exhibit G-Jolly Dep. 17:4-6; Exhibit A-Baker Dep., Exhibit 5, p. 31 of 34 at 4:37 p.m.). He had received reports before arriving at the Vessel that the fire was on Deck 8. (Exhibit G-Jolly Dep. 95:16-96:6). As soon as he arrived, and before he spoke to the Vessel's crew, he spoke to Incident Command, Chief Lundy. (Exhibit G-Jolly Dep. 86:16-87:25; 88:1-7; 94:23-95:4). Before Chief Jolly did his own recon of the Vessel, he did not review the fire control plan and despite having already talked with Incident Command, he was unaware of whether Incident Command had the fire control plan at that point. (Exhibit

G-Jolly Dep. 200:8-13). Chief Jolly never reviewed the Vessel's fire control plan and never asked to see the Vessel's fire control plan. (Exhibit G-Jolly Dep. 200:14-22; 201:5-9).

17.     The JFRD asked the Chief Officer of the Vessel to enter the command van to help the JFRD interpret the fire control plan. The Chief Officer provided a "detailed explanation" to the JFRD as to the access points for Deck 8. (**Exhibit I**-Chief Officer Zhang Dep. 89:1-90:21; **Exhibit J**-Lesniak Dep. 55:21-56:6; 57:6-12).

18.     The aft, port stairwell that provides access to all decks of the Vessel was visible from Deck 5 of the Vessel, the deck where the members of the JFRD entered the Vessel. (Exhibit B-Drysdale Dep. 78:4-10).

19.     5:36 p.m. At 5:36 p.m. the JFRD gave the command "YOU CAN ADVANCE" and JFRD entered Deck 8 of the Vessel for the first time on June 4, 2020. (Doc. 5 First Amended Complaint, ¶40; Exhibit A-Baker Dep., Exhibit 5, p. 35 of 44 at 5:36 p.m.).

20.     6:43 p.m. At 6:43 p.m. the first backdraft explosion occurred when members of JFRD's Ladder 7, including Lt. Harman, were ordered to open ventilation doors on the top of the Vessel. (**Exhibit K**-Harman Dep. 42:21-25, 43:1-2, 44:21-25, 45:1-14). The JFRD does not report any injuries after this explosion. (Exhibit A – Baker Dep., See p. 40 of 44 of Exhibit 5 at 6:43 & 6:44 p.m.).

21.      6:46 p.m. At 6:46 p.m. a second backdraft explosion occurs when Ladder 7, including Lt. Harman, is again ordered to open the same ventilation door that caused the first explosion. (Exhibit K-Harman Dep. 48:3-50:20). Lt. Harman

testified that he had concerns about opening the vent a second time, but that he opened it again because he was given an order.  (Exhibit K-Harman Dep. 49:13-50:2). This second backdraft explosion is the explosion event Plaintiffs claim caused their alleged injuries and is the subject of Plaintiffs' First Amended Complaint. (Exhibit A – Baker Dep., See p. 40-41 of 44 of Exhibit 5 at 6:46 & 6:52 p.m.).

22.    According to Plaintiffs' expert, Captain Bolcar, the JFRD's actions of opening the ventilation on the top deck of the vessel introduced oxygen into the Vessel and caused the backdraft explosion that injured Plaintiffs. (Exhibit E-Bolcar Dep. 59:9-20; 63:4-64:15).

23.    According to the testimony of Chief Lesniak in a 30(b)(6) deposition of the JFRD, upon arriving at the scene of a fire, the JFRD talk to people with knowledge of the fire but also verify that information. (Exhibit J-Lesniak Dep. 155:15-156:8).

24.     All of the Vessel's officers and crew members met Standards of Training, Certification and Watchkeeping for Seafarers (STCW) under the International Maritime Organization (IMO) relating to their ability to communicate in English and had the appropriate credentials to support same.  (**Exhibit L**-Nadeau Dep. 29:7-24; 33:14-34:7).

25.    The JFRD admitted at deposition that the firefighters who responded to the Vessel fire on June 4, 2020 were not adequately trained by the JFRD to fight a shipboard fire. (**Exhibit M**-Barrow Dep. 145:8-146:1).

## Memorandum of Law

### I.    Summary Judgment Standard

Under Rule 56(a), Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant."  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (*quoting Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; it must be a genuine issue of material fact." *Israel v. John Crane, Inc.*, 601 F. Supp. 3d 1259, 1264 (M.D. Fla. 2022) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."  *Kesinger ex rel. Est. of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

### II.    Maritime Law Applies

Plaintiffs allege they were injured while onboard the Vessel while it was berthed in navigable waters at Blount Island Port in Jacksonville, Florida on June 4, 2020. (Doc. 5 First Amended Complaint ¶17). All parties agree that general maritime law applies to this case including Count I of Plaintiffs' First Amended Complaint against

Hoegh Defendants. (Doc. 67 Order, p. 6, ¶1; Doc. 5 First Amended Complaint ¶3; Doc. 71 Hoegh Defendants' Answer and Affirmative Defenses ¶3).

## III.   Negligence Under General Maritime Law

This action is governed by federal maritime law because Plaintiffs allege their injuries occurred on board the Vessel while it was in navigable waters. *See Carroll v. Carnival Corp.*, 955 F.3d 1260, 1263-64 (11th Cir. 2020) (Where the Eleventh Circuit determined that Plaintiff's action was governed by federal maritime law because Plaintiff's injury occurred on a ship in navigable waters.) (citation omitted). In analyzing a maritime tort case, the Eleventh Circuit "rel[ies] on general principles of negligence law." *Id.* (*quoting Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citation omitted)).

In the present case, Plaintiffs assert a claim of direct negligence against Hoegh Defendants. (See Doc. 5 First Amended Complaint – Count I). "The elements of a negligence claim based on a shipowner's direct liability for its own negligence are well settled: 'a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm.'" *Holland v. Carnival Corp.*, 50 F.4th 1088, 1094 (11th Cir. 2022) (*quoting Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014) (citation omitted)). "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959); *See*

*Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989) ("[W]e hold that the benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have had actual or constructive notice of the risk-creating condition, at least where, as here, the menace is one commonly encountered on land and not clearly linked to nautical adventure.").

In regard to constructive notice, the Eleventh Circuit has identified at least two ways that it can be established:

> First, a plaintiff can establish constructive notice by showing that a "defective condition existed for a sufficient period of time to invite corrective measures." *Id.* (alterations adopted) (quoting *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir. 1988)). Second, a plaintiff can show evidence of "substantially similar incidents in which conditions substantially similar to the occurrence in question must have caused the prior accident." *Id.* (quotation marks and citation omitted). On the other hand, the fact that the cruise line runs the ship is not enough—constructive notice of a risk cannot be imputed merely because a shipowner "created or maintained" the premises. *Everett*, 912 F.2d at 1358-59.

*Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1178-79 (11th Cir. 2020).

The concepts of proximate cause and superseding cause apply in admiralty. *See Exxon Co. v. Sofec*, 517 U.S. 830, 837-838 (1996); *See also Wiegand v. Royal Caribbean Cruises LTD*, 2023 U.S. App. LEXIS 17452, at *12-13 (11th Cir. July 11, 2023) (A third-party that is not a party to the litigation can be a superseding cause that break's the causal chain.). To establish proximate cause the breach of duty must "be a substantial factor in bringing about the harm" and "'[s]ubstantial means more than 'but for' the negligence, the harm would not have resulted. . . ." *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978); *See In re Sea Star Line, LLC*, 2016 U.S. Dist.

LEXIS 186911, at *59 (M.D. Fla. Oct. 13, 2016); *See also Cornish v. Renaissance Hotel Operating Co.*, 2007 U.S. Dist. LEXIS 95115, at *19 (M.D. Fla. Dec. 28, 2007). "Federal courts sitting in admiralty jurisdiction may also draw guidance from 'state law applying proximate causation requirements and from treatises and other scholarly sources.'" *Id.* at *19-20 (*quoting Sofec, Inc.*, 517 U.S. at 839). "Similar to federal common law, Florida courts require 'evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result.'" *Cornish*, 2007 U.S. Dist. LEXIS 95115 at *20 (*quoting Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (citation omitted). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.*

Finally, the Southern District of Florida, sitting in admiralty, has applied Florida law regarding the impermissible stacking of inferences. *Tonelli v. NCL (Bah.) Ltd.*, 428 F. Supp. 3d 1313 (S.D. Fla. 2019). In *Tonelli*, the Southern District of Florida stated:

> In Florida, stacking inferences to reach a conclusion is permitted only if the original inference is established without question:
>
> [A] fact may be established by circumstantial evidence as effectively and as conclusively as it may be proved by direct positive evidence. The limitation on the rule simply is that if a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact

unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences.

*Id.* at 1321 (*quoting Nielsen v. City of Sarasota*, 117 So. 2d 731, 733 (Fla. 1960)). *See Collins v. Marriott Int'l, Inc.*, 749 F.3d 951, 959 (11th Cir. 2014) ("Inferences may be pyramided only if the initial inference is established to the exclusion of any other reasonable theory.") (citation omitted)); *Estate of Brennan v. Church of Scientology Flag Serv. Org.*, 832 F. Supp. 2d 1370, 1377 (M.D. Fla. 2011) ("Attenuated and compound inferences and speculation uniformly fail to create a genuine issue of material fact sufficient to avoid summary judgment").

## Hoegh Defendants' Arguments

### I.   Hoegh Defendants did not breach the duty of reasonable care under the circumstances that existed on June 4, 2020.

In the present case, Plaintiffs allege in Count I that the failure of the Vessel's crew to provide them with basic information such as the location of the fire, how to get to the fire, and the location of the fire hose connections cost firefighters valuable time and prevented the firefighters from efficiently fighting the fire which in turn increased the risks associated with fighting the fire. (Doc. 5 First Amended Complaint ¶¶29-36). Specifically, Plaintiffs allege that because of the lack of information, the JFRD had to send reconnaissance crews into the Vessel. (Doc. 5 First Amended Complaint ¶¶33, 35). However, the record shows that the Vessel's crew provided the JFRD, via the first officer to arrive at the Vessel (Captain Baker), the following information within minutes of arriving:  1) that the Vessel had 11 decks; 2) that the fire was on Deck 8; 3) enough information for Captain Baker to call for a second alarm; 4)

that vehicles were stowed aboard the Vessel, including Deck 8; 5) that the Vessel's crew had sealed off the Vessel; 6) that two crew members had been sent to activate the Vessel's CO2 system; 7) that all of the Vessel's crew were accounted for and off of the Vessel; and 8) the Vessel's fire control plan containing a wealth of information was provided to Captain Baker and passed to Incident Commander, Chief Lundy. (Exhibit A-Baker Dep. 42:1-43:8; 69:13-70:3). The record also shows that the fire control plan showed the location of the two stairwells that provided access to Deck 8 and the layout of the fire protection systems on each deck which included the connection points for the Vessel's water suppression system. (Exhibit B-Drysdale Dep. 100:3-5; 106:1-4; Exhibit C-Kyle Higgins Dep. 118:20-119:21; 120:5-25). Indeed, this was all of the information that the Vessel's crew had to provide. Finally, the record shows that the JFRD does not blindly trust information provided to them from witnesses at the scene of a fire, instead they verify that information. (Exhibit J-Lesniak Dep. 155:15-156:8; (Exhibit G-Jolly Dep. 94:23-96:6). Thus, to allege that the lack of information caused a delay because it caused the JFRD to send in reconnaissance units into the Vessel where otherwise it would not have had to do so ignores the JFRD's modus operandi when arriving at the scene of a fire.

It is clear from the JFRD's dispatch transcripts (Exhibit A-Baker Dep., Exhibits 5 & 6) and his deposition testimony, that Captain Baker did not communicate to the JFRD, or his superiors, all of the information he learned from the Vessel's crew during that all important first meeting between the Vessel's crew and Captain Baker. In fact, Captain Baker did not communicate to the JFRD via radio that the Vessel's ventilation

system had been sealed, the Vessel had a CO2 suppression system, or that the Vessel had sent two crew members to activate the CO2 system. (Exhibit A-Baker Dep. 44:20-45:10; 45:13-15; 45:20-46:1). Captain Baker was also not clear as to whether he had told Incident Commander Chief Lundy that the Vessel's crew had sealed the Vessel and about the activation of the Vessel's CO2 system. (Exhibit A-Baker Dep. 45:20-23). This was all key information that Plaintiffs, including Plaintiff Chief Drysdale and Plaintiff Chief Jolly, allege the lack of which caused delays and increased the risk associated with fighting the fire on June 4, 2020.

Unfortunately for the later arriving Plaintiffs, all this information had been provided to Captain Baker and Incident Commander, Chief Lundy, including the fire control plan which contained a wealth of information. The record is clear that the basic information Plaintiffs allege they needed was provided to the JFRD. The record is clear that the Vessel's crew provided all the information they had to the JFRD. Indeed, the record is also clear that a lack of communication existed *internally* between the first arriving officer of the JFRD (Captain Baker) and the command structure of the JFRD, and ultimately between the command structure of the JFRD and its members, each of which arrived at the Vessel after Captain Baker and Chief Lundy. As a result, Hoegh Defendants are entitled to summary judgment as a matter of law on Count I.

## II. Hoegh Defendants did not have actual or constructive notice of the condition that led to the backdraft explosion that caused Plaintiffs' alleged injuries.

This is not a case where the Vessel's crew had knowledge of a dangerous condition that injured Plaintiffs but simply failed to tell Plaintiffs or the JFRD about

16

that condition.  In the present case, Plaintiffs allege they were injured in an explosion while on board the Vessel, an explosion event that took place two hours and forty-three minutes after the JFRD arrived and long after the Vessel's crew had been ordered off of the Vessel. (See Doc. 5 First Amended Complaint ¶¶ 5, 42-46).  In fact, according to Plaintiffs' expert, the explosion was caused by the actions of the JFRD.  (Exhibit E-Bolcar Dep. 59:9-20; 63:4-64:15).

Plaintiffs have provided no evidence that Hoegh Defendants had actual or constructive knowledge of the cause of the backdraft explosion before it happened such that it could have warned Plaintiffs. From the time the Vessel's crew was ordered off the Vessel and accounted for by Captain Baker and again by Chief Drysdale, the JFRD, including Plaintiffs, were the only ones in a position to understand what was happening on the Vessel and how the conditions were changing.

The record presents no evidence to create a genuine issue of fact about whether Hoegh Defendants had any knowledge of the status of the fire or conditions on board the Vessel after being ordered off the Vessel, how many JFRD members were on board the Vessel, where the JFRD was on board the Vessel, and exactly what the JFRD was doing on the Vessel. As a result, Plaintiffs have failed to satisfy a "prerequisite to imposing liability," that Hoegh Defendants "had actual or constructive notice of the risk-creating condition." *Keefe*, 867 F.2d at 1322, *supra*.

**III.   Assuming arguendo that Hoegh Defendants breached a duty alleged by Plaintiffs, which they vehemently deny, Plaintiffs have failed to establish proximate cause because they have failed to show that the alleged breach was a substantial factor in bringing about Plaintiffs' alleged injuries.**

Assuming arguendo that Hoegh Defendants breached a duty alleged by Plaintiffs in paragraphs 29-36 of the First Amended Complaint, which they vehemently deny, Plaintiffs have failed to provide evidence to show how the alleged failure to provide that information was a *substantial* factor in causing the explosion event that Plaintiffs allege caused their injuries. *See Chavez*, 567 F.2d at 289; *Gooding*, 445 So. 2d at 1018, *surpa*.

Plaintiffs' argument consists of pure speculation and an impermissible stacking of inferences. First, Plaintiffs attempt to impermissibly stack inference upon inference to connect the allegations that there was a lack information from the Vessel's crew with the subject explosion event. Plaintiffs ask this Court to infer:  1) that there was a delay in the JFRD's response to the fire; 2) the alleged lack of basic information caused the delay in the JFRD's response to the fire; 3) that said delay, and no other factors, increased the risk of the explosion event that occurred two hours and forty-three minutes after the JFRD arrived at the Vessel; and 4) that the increased risk caused the subject explosion event. This is a classic example of an impermissible stacking of inferences by Plaintiffs in an attempt to manufacture a causal chain of events that leads back to Hoegh Defendants, and it fails to create a genuine issue of material fact.

In light of the testimony of Plaintiffs' own expert, Captain Bolcar, that the cause of the subject backdraft was the introduction of oxygen into the Vessel when the JFRD

opened the ventilation dampers, Plaintiffs cannot argue that a lack of information was a substantial cause of the backdraft when Plaintiffs themselves know the actual cause of the backdraft.[2]  As a result, Hoegh Defendants are entitled to summary judgment as a matter of law on Count I.

For the same reasons argued above, even if Hoegh Defendants were held to the same standard of care as the other Defendants (i.e., negligently starting the fire) Hoegh Defendants would be entitled to summary judgment.

## IV.   The JFRD's actions of opening the ventilation dampers on the top deck of the Vessel was a superseding cause that was unforeseeable to Hoegh Defendants.

Assuming arguendo that Hoegh Defendants breached a duty of care to Plaintiffs, which they vehemently deny, the JFRD's actions of opening the ventilation dampers on the top deck of the Vessel not once, but twice was a superseding cause of the backdraft explosion that caused Plaintiffs' injuries and exculpates Hoegh Defendants in this matter.

"The doctrine of superseding cause is . . . applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable. It is properly applied in admiralty cases." *Sofec*, 517 U.S. at 837 (*quoting* 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994)). If

---

[2] Not only do Plaintiffs' experts testify that the cause of the backdraft was the opening of the ventilation doors by the JFRD hours after the Vessel's crew evacuated, no other expert in this case has provided a detailed analysis of any other cause of the backdraft.

successful, a superseding cause defense "completely exculpates the defendant of any liability in the matter." *Wiegand v. Royal Caribbean Cruises Ltd.*, 473 F. Supp. 3d 1348, 1352 (S.D. Fla. 2020) (*citing Sofec, Inc.*, 517 U.S. at 837-38)). The applicability of this defense hinges on whether Hoegh Defendants could have foreseen the JFRD's actions of opening the ventilation on the top deck of the Vessel not once, but a second time immediately after the first opening caused an explosion.

At the time the JFRD arrived, the Vessel's crew had sealed the ventilation to the cargo decks of the Vessel and confirmed with Captain Baker of the JFRD that it was sending two crew members to activate the Vessel's CO2 system. (Exhibit A-Baker Dep. 44:20-45:10). The purpose of closing the Vessel's ventilation is to prevent significant amounts of oxygen from entering the Vessel and feeding the fire and to allow the CO2 to work as efficiently as possible. (Exhibit E-Bolcar Dep. 59:9-20; 63:4-64:15). Once the Vessel's crew informed Captain Baker of the status of their firefighting efforts, the crew were removed from the Vessel and not allowed to return. It was unforeseeable by the Vessel's crew that the JFRD would take the opposite approach to fighting the fire and completely undo the precautions taken by the Vessel's crew to fight the fire. In fact, the decision by the JFRD to open the ventilation caused a backdraft explosion not once, but twice. It was also unforeseeable to Hoegh Defendants that the JFRD, especially Station 48 located on Blount Island, would not have adequate training to fight the fire on June 4, 2020. (**Exhibit M**-Barrow Dep. 145:8-146:1).

Further, assuming arguendo it was foreseeable that the JFRD would open up the ventilation dampers and allow oxygen into the area where the fire was located, it was certainly unforeseeable that the JFRD would order the ventilation damper to be opened a second time immediately after the first explosion event. In fact, one JFRD officer that was on scene at the Vessel at the time of both explosion events, Lieutenant Crow, testified that he was "shock[ed]" at the decision by the JFRD to open the ventilation dampers a second time after the first explosion event. (**Exhibit N**-Crow Dep. 43:11-45:16). He further testified that when he heard the call over the radio to open the ventilation dampers again, he began walking away from the Vessel "because [he] knew something was about to happen." (Exhibit N-Crow Dep. 43:11-45:16). Further, it was completely unforeseeable to Hoegh Defendants that the JFRD would open the ventilation dampers with members of the JFRD inside the Vessel and without letting the JFRD members inside the Vessel know what they were planning to do.

The first backdraft caused by the JFRD members working on the top of the Vessel (Ladder 7-Lt. McMullen and Lt. Harmon) put the JFRD on notice that the actions they were taking could cause a catastrophic explosion. However, the JFRD made the unforeseeable and disastrous decision to ignore the warning of the first backdraft and to instead open the ventilation damper a second time causing yet another backdraft, the backdraft that is the subject of Plaintiffs First Amended Complaint.

As a result, Hoegh Defendants are entitled to summary judgment as a matter of law on Count I on the grounds that the JFRD's actions were a superseding cause of Plaintiffs alleged injuries.

## V.     The ISM Code may not be used as the basis for a negligence claim.

Plaintiffs' First Amended Complaint cites ISM Code 1.1.2 as a basis for its negligence claim against Hoegh Shipping & Hoegh Management. However, the Eleventh Circuit has declared that a plaintiff in a maritime action cannot rely on the ISM to support a negligence claim. *See Horton v. Maersk Line, Ltd.*, 603 F. App'x 791, 796-97 (11th Cir. 2015) (*citing Aronson v. Celebrity Cruises, Inc.*, 30 F. Supp. 3d 1379, 1396 (S.D. Fla. 2014) ("[T]he International Safety Management Code does not create any duties and thus cannot be the basis for a negligence claim against a cruise line."); *Rinker v. Carnival Corp.,* 753 F. Supp. 2d 1237, 1243 (S.D. Fla. 2010) ("Plaintiff has failed to present any authority that establishes that the ISM creates any duties that Carnival owes to Plaintiff."); *Calderon v. Reederei Claus-Peter Offen*, 2009 U.S. Dist. LEXIS 97565, at *12 (S.D. Fla. Oct. 20, 2009) ("Congress merely desired to participate with other maritime nations in achieving safety goals [through the ISM], but did not intend to change long-established rules of law which govern liability and its allocation in general maritime law." (citation omitted)).

Hoegh Defendants are entitled to summary judgment as a matter of law on any claims in Plaintiffs' First Amended Complaint that Plaintiff relies upon the ISM Code as a basis for its negligence.

## VI.   Plaintiffs' Unseaworthiness claim must be stricken

The allegations set forth by the Plaintiffs, particularly in paragraph 50 and subparagraphs thereof, allege unseaworthiness and other standards not applicable herein. Plaintiffs are shore-based firefighters, not seamen. It is well settled law that only seamen may bring claims for unseaworthy conditions on a vessel.[3]

Plaintiffs did not allege that they are seaman in their First Amended Complaint and, in fact, are not seaman.   Further, the actions of the JFRD opening up the ventilation dampers on the top of the Vessel was the cause of the backdraft that Plaintiffs allege caused their injuries. Thus, there is no genuine issue of fact as to whether the Vessel or any of the Vessel's equipment was the cause of Plaintiffs' injuries. As a result, Hoegh Defendants are entitled to summary judgment on any claim by Plaintiffs that the Vessel was unseaworthy.

## Conclusion

Based upon the Statement of Undisputed Facts and the arguments set forth above, Hoegh Defendants respectfully move this honorable Court for an Order granting summary judgment in their favor.

---

[3] Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 208 n.6 (1996) (In a discussion about the doctrine of unseaworthiness, the U.S. Supreme court stated "[t]he Court extended the duty to provide a seaworthy ship, once owed only to seamen, to longshore workers in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S. Ct. 872, 90 L. Ed. 1099 (1946). Congress effectively overruled this extension in its 1972 amendments to the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. See § 905(b). We have thus far declined to extend the duty further. (citation omitted); In re Royal Caribbean Cruises Ltd., 459 F. Supp. 2d 1275, 1282 (S.D. Fla. 2006) ("In *Calhoun* the U.S. Supreme Court recognized that the doctrine of unseaworthiness was limited to seamen or maritime workers. Additionally, the holding in Calhoun cannot be construed as expanding the doctrine of unseaworthiness to guests or passengers aboard a vessel.").

Dated this 1st day of August 2023.

Respectfully submitted,

MOSELEY PRICHARD PARRISH
KNIGHT & JONES

/s/ *James F. Moseley, Jr.*
James F. Moseley, Jr.
Florida Bar No. 699926
Email:  jmoseleyjr@mppkj.com
Shea M. Moser
Florida Bar No. 0029265
Email:  smoser@mppkj.com
501 W. Bay Street
Jacksonville, FL 32202
Tel: (904) 356-1306
Fax: (904) 354-0194
*Attorneys for Defendants*
*Hoegh Autoliners Management AS &*
*Hoegh Autoliners Shipping AS*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of August 2023, I electronically served the foregoing via the Clerk of Court by using the CM/ECF E-Filing system and via electronic mail to the following counsel of record: Benjamin E. Richard, Curry G. Pajcic, Raymond P. Reid, Jr., Thomas F. Slater, *Counsel for Plaintiffs* [ Ben@Pajcic.com; Curry@Pajcic.com; Rose@Pajcic.com; Raymond@Pajcic.com; Michelle@Pajcic.com; Tom@Pajcic.com; MHill@Pajcic.com; Nancy@Pajcic.com ]; Brandon Bushway, Jules V. Massee, *Counsel for Defendant Horizon Terminal Services, LLC* [ BBushway@HamiltonMillerLaw.com; JVMServe@HamiltonMillerLaw.com; JMassee@HamiltonMillerLaw.com; JParmerlee@HamiltonMillerLaw.com; SKibiloski@HamiltonMillerLaw.com; KSadler@HamiltonMillerLaw.com ]; David F. Pope, Eric C. Thiel, *Counsel for Defendant Grimaldi Deep Sea, S.P.A.* [ DPope@BankerLopez.com; LSchindler@BankerLopez.com; MAshford@BankerLopez.com; ServiceDPope@BankerLopez.com; YHernandez@BankerLopez.com; EThiel@BankerLopez.com; EGoins@BankerLopez.com ]; Dennis B. Keene, Lucas D. Bradley, Todd M. Baiad, *Counsel for Defendant SSA Atlantic, LLC* [ DKeene@Bouhan.com; EVincent@Bouhan.com; LPruette@Bouhan.com; LDBradley@Bouhan.com; TMBaiad@Bouhan.com; LRWeeks@Bouhan.com ].

/s/ *James F. Moseley, Jr.*
Attorney