## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

### CASE NO.: 3:20-cv-1150-MMH-MCR

KRISTOPHER JOLLY and CHERYL JOLLY, his
wife; JEREMY LEE and AMY LEE, his wife;
MATTHEW CIPRIANI; SHAWN O'SHELL and
MALISSA O'SHELL, his wife; PAUL MASCI and
ANGELA   MASCI   his   wife;   NICHOLAS
GETTLER; CHARLES DRYSDALE; LANDON
SIMMONS and SARAH SIMMONS, his wife,
SAMUEL L. BANKS, and AMANDA BANKS,
his wife, WILLIAM REED and HOLLY REED,
his wife; And WESLEY MILLER and SHANNON
MILLER, his wife,

               Plaintiffs,

vs.

HOEGH AUTOLINERS SHIPPING AS; HOEGH
AUTOLINERS   MANAGEMENT   AS;   HOEGH
AUTOLINERS   INC.;   HORIZON   TERMINAL
SERVICES, LLC; GRIMALDI DEEPSEA S.P.A.,
and SSA ATLANTIC, LLC,

               Defendants.

_____/

## <u>DEFENDANT HORIZON TERMINAL SERVICES, LLC'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant HORIZON TERMINAL SERVICES, LLC ("Horizon"), by and

through its undersigned counsel and pursuant to Federal Rule of Civil Procedure

56, moves this Honorable Court for summary judgment.

## ARGUMENT SUMMARY

Plaintiffs cannot establish legal causation, let alone negligence (or the link between the two) – all essential elements of their case against Horizon.  The only way Plaintiffs can establish Horizon's liability at trial is if they prove the fire started in or from a vehicle *and* was caused by Horizon's failure to act with reasonable care.  After 75 depositions taken in this case, not a single witness, expert or otherwise, has been able to testify as to the specific vehicle in or from which the fire started.  Without identifying the specific vehicle, it is impossible to connect the fire's cause with any purported act or omission on Horizon's part without impermissible speculation.  Plaintiffs may attempt to manufacture an issue of fact by stacking inference upon unreasonable inference, but, whether taken in isolation or in combination, these inferences cannot discharge their burden.

## FACTS

1. The *HOEGH XIAMEN* (the "Ship") is a roll on, roll off ship for carrying automobiles, trucks, and sometimes heavy equipment. (See Ex. 1. Michael Loeuis Dep., July 13, 2022, 20:15-21:14,).

2. Defendant Hoegh Autoliners Management AS was the *HOEGH XIAMEN's* manager and operator of the Vessel (D.E. 71 at ¶ 9).

3. The *HOEGH XIAMEN* was time chartered to Defendant Grimaldi ("Grimaldi") at all times material. (D.E. 68 at ¶ 13.)

4.     At all times material, the Vessel was transporting used vehicles from the U.S to West Africa. (Ex. 1 at 19:13-21:18).

5.     The used vehicles to be loaded on the *HOEGH XIAMEN* were in varying degrees of disrepair. (See Ex.2 Zhang Xiu Lei Dep., Dec. 20, 2022, 39:18-21; Ex.3 Charles Isenberg Dep., Sept. 2, 2022, 22:14-16.)

6.     Grimaldi hired Horizon to receive and stage vehicles in Jacksonville for shipment on the *HOEGH XIAMEN*. (Ex.1 21:19-23:7) (*See* Horizon Terminal Services' rate sheet as Ex. 4)

7.     Horizon's role was limited to receiving and staging vehicles onshore. (Ex. 3 24:12-23) (Ex. 5 Ryan Bouchelle Dep., Sept. 14, 2022, 41:11-17) (Ex. 6 John White Dep., Sept. 1, 2022, 25:14-21) (*See* Grimaldi Receiving Policy as Ex. 7).

8.     The average time a vehicle was in the terminal between receiving and loading was 18 days.  (See Jacksonville Load List attached hereto as Ex.8). But a vehicle could sit for months after being checked-in. Ex. 6 at 24:25-25:7.

9.     The vehicles were divided into three categories:  Runners which could be driven onto the Ship, Non-Runners which could be towed onto the Ship and Forklifts, which would have to be loaded onboard by Forklift.  See Ex.7.

3

10.     Grimaldi contracted with SSA Atlantic, LLC ("SSA") to provide stevedore services to load the vehicles aboard the Ship. (Ex. 1 at 23:18-24:9).

11.     SSA was also tasked with disconnecting vehicle batteries on Runners and Non-runners, while Forklift vehicles' batteries would be disconnected by Port Storage & Delivery.  (Ex. 9 Giuliano Petrellese Dep., Nov. 29, 2022, 34:5-11; 35:4-6; 62:19-24). (Battery Disconnect Policy Ex. 10).

12.     1,575 vehicles were loaded by SSA onto the *HOEGH XIAMEN* in Jacksonville on June 3 and June 4. (Ex. 6 at 18:20-19:2)  (*See* Recap of Cargo loaded in Jacksonville as Ex. 11).

13.     A total of 358 vehicles were loaded in Jacksonville on deck 8. (Ex. 1 at 19-20) (*See* Vessel Lashing Inspection Procedure Form as Ex. 12).

14.     A fire occurred on the *HOEGH XIAMEN* on the afternoon of June 4 after the loading.

15.     At the time of the fire 2,420 vehicles were onboard the *HOEGH XIAMEN*. (*See* Ex. 11 and Recap of Cargo loaded in Freeport as Ex. 13).

16.     The Vessel Lashing Inspection Procedure form filled out by SSA employee Ethan Walker and given to the Vessel crew after loading indicated that 13 of the 358 vehicles did not have a battery disconnected. (Ex. 1. at 152:19-25; Ex.2 at 45:4-47:16) (Ex. 14 Ethan Walker Dep. 6:10) (*See* Ex. 12).

## SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.56(a)*. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)*. The moving party's burden is discharged merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)*. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v.Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996)*.

Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)*. The nonmovant may not simply rest upon mere allegations or denials of the pleadings; it must establish the essential elements of its case on which it will bear the burden of proof at trial. *Id*. The nonmovant must present more than a scintilla of evidence in

support of the nonmovant's position. A jury must be able reasonably to find for the nonmovant. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).*

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. And a material fact is in genuine dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, an inference deduced from the evidence must be "reasonable" to create a genuine dispute of material fact. *Berbridge v. Sam's E., Inc., 728 F. App'x 929, 932 (11th Cir. 2018)* (citing *Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1326 (11th Cir. 1982)*). While federal courts do not prohibit "inference stacking,"[1] the more inferences are stacked upon one another, the less likely it is that the resulting conclusion is one that "reasonable and fair-minded [people] in the exercise of impartial judgment might draw from the evidence." *Daniels, 692 F.2d at 1326.*

## ARGUMENT

### A.   NO SPECIFIC VEHICLE CAN BE IDENTIFIED AND THAT ALONE IS FATAL TO PLAINTIFFS' CLAIMS AGAINST HORIZON

At the outset, it is important to note that none of the Origin and Cause Experts disclosed in this case have been able to determine more than a generalized

---

[1] Florida state courts guard against unreasonable inferences by prohibiting "inference stacking," the practice of making an inference "which has been superimposed upon an initial inference supported by circumstantial evidence." *Little v. Publix Supermarkets, Inc., 234 So. 2d 132,134 (Fla. Dist. Ct. App. 1970)* (citing *Voelker v. Combined Ins. Co. of Am., 73 So. 2d 403 (Fla.1954)*).  See also *Berbridge, 728 F. App'x at  932* (explaining that while federal courts are not bound to apply state law rules against inference stacking, state court decisions on summary judgment "may still be highly informative" and "[federal courts] aim to reach the same result that the Florida courts would reach based on the same facts").

area on the ship where the fire originated.  The consensus reached appears to be that the fire originated somewhere on Deck 8, starboard side, aft.  Accordingly, for purposes of this motion this fact is taken as true.

Unlike origin, consensus among the experts breaks down as to cause.   Two of the experts opined the cause was undetermined.  The other two (including the Plaintiffs' expert) opined that the fire was more likely than not caused by a vehicle's electrical system.   Though causation remains at issue, and Horizon concedes nothing on that front, here again for summary judgment purposes it is accepted that the fire started from a vehicle.  As discussed below, whether the source of a fire was a vehicle or otherwise, it does not affect Horizon's entitlement to summary judgment.

The *HOEGH XIAMEN* had 2,420 vehicles onboard at the time of the fire, 1,575 of which were loaded in Jacksonville.  Of these, 358 were stowed on Deck 8. Narrowed down further, approximately 33 vehicles were in the general area of origin identified by the various experts.  Beyond this, not even those experts who deduced that a vehicle somehow must have started the fire could identify *which* vehicle it was.

Plaintiffs' expert, Paul Way unequivocally testified he could not identify a specific car as the cause of the fire.  Ex. 15 Way Dep., June 21, 2023, 39:13-15. He could not point to any vehicle in the general area of origin whose battery was

either connected or improperly disconnected and had no evidence of arcing. *Id.* at 192:23-193:4. Way likewise could not identify any vehicle within the general area of origin that was leaking any type of flammable liquid. *Id.* at 194:18-21. Lastly, Way did not know whether any of the vehicles in the general area of origin contained any materials in the trunks or passenger compartments. *Id.* at 198:14-20; 199:4-16.

Hoegh expert Robert Harshman gave similar testimony:

**Q. Put it another way: I think I read your report to say that you didn't find a vehicle with definitive evidence suggesting that it was the origin of the fire. Correct?**

**A. We didn't find any vehicle that – that said it was -- in any -- any specific vehicle evidence that said that it was specifically the cause of the fire. We found some -- several that could have.**

Ex. 16 Harshman Dep., April 13, 2023, 160:21-161:4. As to these vehicles that "could" have started the fire, Harshman could not say whether any of these cars were leaking, and testified that he did not find any evidence of any objects inside a vehicle other than the battery and electrical system that could have been a source of the fire. *Id.* at 176:19-22; 185:13-19.

Taking the above experts' opinion testimony as true, Plaintiffs' can at best only establish that one out of the 33 or so vehicles in the general area of origin *must* have caught fire and the source of ignition *must* have been from the unidentified vehicle's electrical system. Without more, Plaintiffs' argument is a

*post hoc* fallacy; the *only* causal connection to Horizon being merely that Horizon's receiving the vehicle at the terminal occurred before the fire. Consequently, Plaintiffs' failure to identify a specific vehicle as the culprit is fatal to their claim against Horizon because without doing so, it is impossible to determine what, if anything, Horizon did or did not do when receiving that vehicle. By logical extension, it is then impossible to determine how the purported error or omission actually caused any harm to the Plaintiffs.[2]

Plaintiffs must demonstrate by a preponderance of the evidence that Horizon's actions caused the fire at issue. *See Arnold v. Heritage Enterprises of St. Lucie, LLC*, No. 2:13-CV-14447, 2017 U.S. Dist. LEXIS 225609, 2017 WL 108416969, at *8 (S.D. Fla. July 19, 2017). "[P]roving the cause and origin of a fire... requires expert testimony based on a forensic fire investigation, in accordance with the National Fire Protection Association Standard 921." *Id.* at *9 (citing *United Fire and Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013)).  Because not a single fire investigation expert retained in this case by

---

[2] Plaintiffs do not get the benefit of a *res ipsa loquitur* theory.  First off, Plaintiffs did not plead it.  But even if they had, it would fail because the undisputed facts clearly show that Horizon had <u>no</u> control, let alone exclusive control, of any of the vehicles or the *HOEGH XIAMEN* at the time of the fire.  One of the required elements of *res ipsa loquitur* is that the instrumentality causing the injury was under the exclusive control of the defendant. *See e.g. Arnold v. Heritage Enters. of St. Lucie, LLC*, 2017 U.S. Dist. LEXIS 225609, *24-25 (citing *U.S. v. Baycon Industries, Inc.*, 804 F.2d 630, 633 (11th Cir. 1986); *Terry v. Carnival Corp.*, 3 F. Supp. 3d 1363, 1372 (S.D. Fla. 2014)). In *Arnold*, the court held that on the day of, and the days leading up to, a vessel fire, the vessel captain, and two contractors were all working on the vessel, with the captain specifically working on the inside of the vessel and with the vessel's wiring, and as a result the defendants did not have the exclusive control necessary for *res ipsa* to apply. 2017 U.S. Dist. LEXIS 225609, *24-25.

any party proffers conclusions that support a reasonable inference that Horizon's actions or inactions caused the fire, the Court's inquiry should stop here and summary judgment should be granted in Horizon's favor. *See Bloch v. Beard Marine Air Conditioning & Refrigeration, Inc.*, 2019 U.S. Dist. LEXIS 223541, *4 (granting summary judgment where third-party plaintiff failed to proffer an expert offering conclusions that more likely than not third-party defendants' hot-work caused vessel fire).

### B.   IMPERMISSIBLE INFERENCES

As discussed, *supra*, there is no direct evidence as to the specific vehicle that caused the fire, and the experts' opinions, taken as true, are based purely on circumstantial evidence. Thus, at the outset Plaintiffs' case against Horizon begins with an inference (that an unidentified vehicle's electrical system ignited the fire). Assuming *arguendo* that this initial inference is reasonable, it is still not enough to connect Horizon to the fire. Plaintiffs must bridge the gap through multiple, stacked inferences, none of which a reasonable and fair-minded person could draw from the undisputed facts of this case.

The first inference that Plaintiffs' must establish, and upon which all other inferences must be stacked, is that the unidentified vehicle was in essentially the same condition at the time of the fire as it was when received/staged by Horizon. This inference is patently unreasonable. After being checked in by Horizon, a

vehicle would be transported to a staging area and parked.  Once checked, Horizon did not recheck the vehicles, nor were they required to do so.  *See, e.g.,* Ex. 5 at 41:11-14; Ex. 6 at 25:14-21. A vehicle would then sit, parked in the terminal, exposed to the elements for a minimum of three days for customs to clear.  But no vehicle only waited three days.  Horizon personnel anticipated the period to be more, 17 to 21 days; however, some vehicles would be staged for *months*, before being loaded. Ex. 6. at 24:25-25:7.  Indeed, one of the vehicles, a Toyota RAV4, had been in the terminal for 246 days.  Ex. 8 at 6.  On average, the vehicles intended to be loaded onto the HOEGH XIAMEN sat at the Blount Island Terminal for 18 days. Ex. 8.

Then, after a period of sitting in the terminal, SSA (*not* Horizon) drove or transported the vehicles onto *HOEGH XIAMEN*, stowed and lashed them, and disconnected (or tried to disconnect) the batteries.[3]  SSA's shoreside activities in this regard included jump starting Runner vehicles, and driving, towing, pushing, and carrying vehicles by forklift.  Onboard the *HOEGH XIAMEN*, SSA "battery brigades" then went through the ship in accordance with Grimaldi's Battery Disconnect Policy.

Given the length of time the vehicles sat staged, and the fact that other parties handled the vehicles after Horizon staged them, no reasonable person,

---

[3] Some vehicles needed to be loaded by forklift, for those vehicles the batteries were disconnected by yet another Grimaldi contractor, Port Storage & Delivery.

without more, could conclude that it was more likely than not that *any* of the vehicles were in the same condition at the time of the fire as they were when checked in by Horizon.  This is especially true considering that these vehicles were used and in less-than-pristine condition to begin with.[4]  Obviously, a lot can happen between check-in and loading:  hood mechanisms can jam, or rust shut; seals can deteriorate and spring leaks; vehicles can be damaged during transport, loading or lashing; items can be left in a vehicle by a driver; a lit cigarette could be dropped in a passenger compartment.

Ultimately, Plaintiffs cannot rule any of this out, since they cannot even establish which vehicle started the fire. As a result, they cannot establish when the vehicle was received, how long it sat staged, or what SSA did with the vehicle afterward, absent abject speculation.  Such speculation cannot support a reasonable inference that anything Horizon did or did not do caused the fire.

After the first two threshold inferences -- namely that the culprit was a vehicle and that it somehow remained in the same condition as when received by Horizon – Plaintiffs must then stack a third inference in order to connect the fire to Horizon's conduct.  It is anticipated that Plaintiffs will attempt to do so on one or

---

[4] Grimaldi Port Captain Michael Loeuis confirmed that vehicles can develop issues *after* check-in:

**Say for example a runner or non-runner that was received became a forklift unit, we wouldn't load it. We would cut it to get approval from the customer to load as forklift on this vessel or typically there is a mechanical issue with the unit. For example, a truck, something that doesn't start, maybe you can't jump start it or it doesn't go into gear.**

Ex. 1.at 60:6-13.

more of three theories: that Horizon accepted a vehicle with a hood that could not open, accepted a leaking vehicle, or accepted a vehicle containing cargo or debris. None of these inferences are reasonable by themselves, let alone stacked upon other unreasonable inferences. We take each in turn:

<u>**Vehicle Hoods**</u>

As an initial matter, there is no record evidence that any of the vehicles in the general area of origin had hoods that could not be opened, thereby preventing batteries from being accessed. On Deck 8, 13 out of 358 vehicles' batteries remained connected at the time of the fire according to a Vessel Lashing Inspection Procedure form filled out by SSA. On the form, no explanation is given as to why. However, Ethan Walker, who signed the form, explained that there were a variety of reasons, a hood being the *least* likely, why SSA would leave a battery connected:

> **A The numbers of vehicles with the batteries disconnected is based on whether we can actually get to the battery –**
>
> **Q Okay.**
>
> **A -- <u>or locate the battery</u>, sir. And that is something that we note to the port captain every time we see him. We had this many vehicles, the batteries couldn't be disconnected, and this is why.**
> **Q Okay. And typically, the batteries are not disconnected because you can't open the hood.**
>
> **A <u>No, sir. Generally if it's a hood, we can get to those batteries most of the time, but not always. We have had our mechanics go</u>**

**on board with Sawzalls and cut the hoods to be able to get into
them, but sometimes it's just not possible to get to the batteries.**

**Q Okay.**
**A They're either located in the trunk, under the vehicle, under the
passenger's seat. And these cars are parked four inches -- two to
four inches apart and -- side to side, and 12 to 18 inches front and
back, so...**

**Q Tight quarters.**

**A Yes, sir.**

Ex. 14. at 27:14-28:12 (emphasis added).  Walker's testimony was strikingly
similar to Horizon terminal manager John White's; clearly a vehicle hood is not a
particularly daunting obstacle:

**Q Okay. While you were at Horizon, did you ever fail to get a
vehicle's hood open?**

**A Not to my knowledge, no sir.**

**Q Okay. So, even if the driver couldn't get it opened, you would
find a way to get it open?**

**A We typically try to, yes sir.**

**Q Okay. And that could involve a crowbar?**

**A Whatever you could get it open.**

**Q Okay. And did you have open the hood with a forklift?**

**A You could.**

**Q Okay. Does that damage the vehicle further?**

**A It depends. You would do it based on -- depending on the
damage of the vehicle already.**

14

**Q Okay.**

**A Obviously a nice vehicle were not done, so.**

**Q Typically a nice vehicle you wouldn't have any trouble opening the hood anyway?**

**A Correct.**

Ex 6. at 21:24 -22:17.  And if a problem were to later develop with a hood, all Grimaldi or SSA had to do was ask for help:

**Q Okay. And I asked you about popping the hood. Would it be correct to say that every vehicle that Horizon accepts would have an open hood, either opened or capable of being opened?**

**A I would say that our job is to make sure that they open to the best of our ability. I will also say that, you know, these cars are bottom-of- the-barrel cars that come from junkyards and whatever. And just because you take a car off of your truck today and the hood is popped and then it sits there for a couple of months and you go to open it up in a couple of months, it might not open. And then, therefore, when it goes time for the ship, then that's when -- you know, prior to going on the ship, they say, "Hey, we need to get this hood open," and that's usually when we pop them with the forklifts or crowbars.**

**Q Well, that was going to be the next question. Have you received any feedback or complaints from stevedores about some of the cars with hoods that don't open?**

**A I won't say complaints because, you know, it happens, but normally on a typical ship that I'm working in my yard, I might get one or two phone calls per the ship saying, "Hey, can you come get this hood open?" And some of them it's a matter of, you know, one person on the inside open and the other person on the outside open it. And it's that easy or, you know, you get a crow bar under there and you pry it open.**

> **Q Okay. So, when -- let's be specific as to Grimaldi. Do you remember if any stevedores called about Grimaldi vehicles to ask you for help in getting hoods open?**
>
> **A For Grimaldi?**
>
> **Q Yes.**
>
> **A Oh, yeah. I've got calls to open a hood for Grimaldi before.**
>
> **Q All right. And when you get a call like that, does that mean you have to go aboard the ship to the vehicle?**
>
> **A I have been here for 14 years and I've never once been called on a ship to open a hood on there. You know, they have their people on the ships and once it gets up there, I guess, they take care of, if there's any problems like that or whatever, but I've never been on a ship for that.**

Ex. 3. at 22:9 – 24:4.  Mr. Isenberg's testimony makes sense, because, at least in the case of the Runner vehicles, SSA would need to access the hoods while the vehicles were still on the dock to jump start vehicles so they could be driven on to the *HOEGH XIAMEN*.  Ex. 17 Blake Newton Dep., Nov. 17, 2022, 24:25-25:15.  No complaint was ever made to Horizon regarding hoods that couldn't be opened on the ship.  Ex. 18 Patrick Tamasitis Dep., Nov. 17, 2022, 16:17-24.

Finally, Plaintiffs' own expert, Thomas Bolcar, had to tacitly concede that an inoperable hood is a feeble excuse for not accessing a battery:

> **Q So you can't point me to a single car where the hood couldn't be opened that was loaded onto the Hoegh Xiamen that day, can you?**
>
> **A Not by VIN number, no.**

16

**Q By any other means?**
**A No.**

**Q And why -- why focus so much on the hood?**

**A It's a matter of when the car's received, if they can't get the hood opened, then that's going to increase the chances markedly that a battery-connected car -- or that when it gets on the ship, SSA won't be able to -- will have a difficult time disconnecting the battery.**

**Q Okay. But to your first point, okay, you cannot point to a single car that was admitted into the terminal by Horizon where the hood couldn't open, can you?**

**A No, I can't.**
**Q Okay. Now, as far as the effect if a hood couldn't be opened, I want to direct you to your earlier testimony, because here's the thing, how long have you been doing stevedoring?**

**A A long time.**

**Q Okay. 40 years-plus?**
**A Yes.**

**Q All right. You ever met a hood you couldn't open?**

**A No.**

**Q Okay. That's what John White said, too. All right. You know, this idea of, well, a hood couldn't open, he wasn't aware of that.**

**A I've never met a hood I couldn't open.**

Ex. 19 Thomas Bolcar Dep., April 26, 2023, 211:22-213:3.

## **Vehicle Leaking**

There is no record evidence showing that any of the vehicles in the general area of origin were leaking.  Harshman and Way concede this. Ex. 16. at 176:19-22; Ex. 15 at Dep. 194:18-21. Witness testimony from the *HOEGH XIAMEN* crew supports the opposite conclusion.  The Ship's Second Officer testified:

> **Q. While vessel -- while vehicles were being loaded on the vessel in Jacksonville, do you remember having to clean up because there were -- there were fluids leaking from any of the cars?**
>
> **A. During the time I was on duty, I didn't see any leaks.**
>
> **Q. Did any of your fellow crew members tell you that they saw any of the vehicles leaking fluids?**
>
> **A. On that day, no.**
>
> **Q. On either of the days that vehicles were being loaded on the vessel, do you remember seeing any vehicles that were taken off of the vessel for any reason?**
>
> **A. During the time of my duty, no.**

Ex. 20 Min Zhao Dep., Aug. 2, 2022, 17:9-22.  And vehicles, if they did leak, would usually be leaking non-flammable fluids, like lube oil.  *See* Ex. 2. at 33:10-14.  In any event, Plaintiffs will not be able to present any evidence whatsoever that would support the *inference* that a vehicle that was leaking flammable liquid at the time Horizon received it.  And, if a vehicle later sprung a leak and was later loaded onto the Ship severely leaking fuel, then it was up to the HOEGH XIAMEN crew to refuse to load the vehicle.  *See* Ex. 21 Capt. Shi Lian Zhang Dep.  30:12-

23.  So, here again, Plaintiffs cannot establish a causal link by stacking multiple unreasonable inferences.

### Vehicles Containing Cargo or Debris

Plaintiffs are expected to point to evidence that debris, specifically paint cans and ammunition, were found in two vehicles *after* the fire, and offer this as proof that the unidentified vehicle suspected to have started the blaze also contained things it should not have.  This is plainly inadmissible character/habit evidence, but even if it were admissible, it *still* cannot support an inference that any of the vehicles in the general area of origin contained similar items.

First, there is no evidence of anything being in any of the vehicles in the general area of origin.  Here again, Harshman and Way concede this.  Ex. 16 at 185:13-19; Ex. 15 at 198:14-20; 199:4-16.  Second, the photographs, assuming that they are authentic and actually depict vehicles that were onboard the *HOEGH XIAMEN*, show that they are unburned with equally unburned items inside.  *See* Photos attached hereto as Ex. 22.  These vehicles, therefore, were clearly not involved in the fire in any way, and certainly did not cause or contribute to it.

Given that these photos have no connection whatsoever to the fire, they would be offered only to show that Horizon somehow acted in "character" and must have received vehicles with prohibited items that somehow contributed to the fire.  Not only is this a stretch, but it also violates Fed. R. Evid.  404 (a)(1), which

provides "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  In other words, even taken as true, just because two vehicles (out of 1,575 loaded in Jacksonville) contained items that should have been removed, it does not follow that the vehicles on Deck 8 in the general area of origin somehow must have also contained these items.

"On motions for summary judgment, [a court] may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005)*; see *Celotex Corp., 477 U.S. at 324* (explaining that the nonmovant need not produce evidence at the summary judgment stage "in a form that would be admissible at trial in order to avoid summary judgment"). Since Plaintiffs cannot produce plainly prohibited evidence in *any* form, they cannot rely upon it here to survive summary judgment.

The result is the same if Plaintiffs attempt to try to introduce the photos as "habit" evidence. *Rule 406* provides in pertinent part that "[e]vidence of the . . . routine practice of an organization . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice." *Fed. R. Evid. 406*. While the Eleventh Circuit has not articulated a "precise formula for determining when a practice of an organization is so consistent that it becomes routine or habitual," it has held that "'adequacy of

20

sampling and uniformity of response" are controlling considerations [in making such a determination]." *Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1285 (11th Cir. 2008)* (quoting *Reyes v. Mo. Pac. R.R., 589 F.2d 791, 795 (5th Cir. 1979)*, and *Fed. R. Evid. 406* advisory committee's note). In other words, "conduct admitted as evidence of habit must reflect a *systematic response to specific situations* to avoid the danger of unfair prejudice that ordinarily accompanies the admission of propensity evidence[.]" *Id.* (emphasis added). Thus, the examples proffered to establish habit or pattern must be "numerous enough to base an inference of systematic conduct" and to establish "one's regular response to a repeated specific situation" before they are admissible to establish a pattern or habit. *Id.* (quoting *G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1533 (11th Cir. 1985)*. Based on that standard, the *Goldsmith* court held that the plaintiff's proffered evidence of "only four" other instances of behavior conforming to the alleged conduct in the plaintiff's case was insufficient to establish habit or pattern. *Id.*

The photographs show two vehicles. Two. Assuming that these vehicles were loaded in Jacksonville, and not part of the shipment that had been loaded on the *HOEGH XIAMEN* in another port, they represent only .0127% of the 1,575 staged by Horizon. Thus, even if taken in the light most favorable to the Plaintiffs,

this evidence would not even come close to supporting an inference of systematic conduct.

**Wherefore,** Defendant HORIZON TERMINAL SERVICES, LLC respectfully requests this honorable Court grant its Motion for Summary Judgment and such other and further relief as deemed just and proper.

Respectfully submitted,

_/s/   Jules V. Massee_
**JULES V. MASSEE**
Florida Bar Number:  026997
jmassee@hamiltonmillerlaw.com
**BRANDON BUSHWAY,** FBN: 1015247
bbushway@hamiltonmillerlaw.com
100 S. Ashley Drive, Suite 1210
Tampa, Florida 33602
**SERVICE E-MAIL**:
JVMserve@hamiltonmillerlaw.com
Tel: 813-223-1900 / Fax:  813-223-1933
_Counsel for Defendant Horizon Terminal Services, LLC_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on **August 2, 2023**, the foregoing document is being filed with this Court and served on all counsel of record or _pro se_ parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized

manner for those counsel or parties who are not authorized to receive electronically

Notices of Electronic Filing.

/s/Jules V. Massee
Attorney

### SERVICE LIST
### 3:20-cv-01150

**BENJAMIN E. RICHARD**
Florida Bar No. 13896
Ben@pajcic.com
**CURRY GARY PAJCIC**
Florida Bar No.21301
Curry@pajcic.com
**THOMAS F. SLATER**
Florida Bar No.614114
tom@pajcic.com
PAJCIC & PAJCIC, PA
One Independent Drive, Suite 1990
Jacksonville, FL 32202
Rose@pajcic.com
T: 904-358-8881
Hoegh@pajcic.com
*Attorneys for Plaintiffs*


**ERIC C. THIEL**
Florida Bar No.: 016267
ethiel@bankerlopez.com
**DAVID F. POPE**
Florida Bar No. 164452
dpope@bankerlopez.com
BANKER LOPEZ GASSLER, P.A.
501 East Kennedy Blvd, Suite 1700
Tampa, Florida 33602
T: (813) 221-1500
F: (813) 222-3066

**DENNIS B. KEENE**
Florida Bar No. 982598
dkeene@bouhan.com
**TODD M. BAIAD** – *pro hac vice*
Georgia State Bar No. 031605
tmbaiad@bouhan.com
**LUCAS D. BRADLEY** – *pro hac vice*
Georgia State Bar No. 672136
ldbradley@bouhan.com
Post Office Box 2139
Savannah, Georgia 31402-2139
T: (912) 232-7000
F: (912) 233-0811
*Attorneys for Defendant SSA Atlantic,
LLC*


**TIMOTHY J. CONNER**
Florida Bar No. 767580
timothy.conner@hklaw.com
HOLLAND & KNIGHT, LLP
50 N Laura St, Suite 3900
Jacksonville, FL 32202
T: 904-353-2000
F: 904/ 358-1872
*Attorneys for Defendant Hoegh
Autoliners, Inc.*

**JAMES F. MOSELY, JR.**

service-ethiel@bankerlopez.com
*Counsel for Defendant Grimaldi Deep Sea S.P.A.*

Florida Bar No. 699926
jmoseleyjr@mppkj.com
**SHEA M. MOSER**
Florida Bar No. 0029265
smoser@mppkj.com
MOSELEY PRICHARD PARRISH
KNIGHT & JONES
501 W. Bay Street
Jacksonville, FL 32202
Tel: (904) 356-1306
Fax: (904) 354-0194
*Counsel for Defendants Hoegh Shipping & Hoegh Management*